STATE of Iowa, Appellee,

v.

Steven Wayne HILL, Appellant.

No. 58728.

Supreme Court of Iowa.

June 30, 1976.

**568**

John C. Wellman, Des Moines, for appellant.

Richard C. Turner, Atty. Gen., Thomas Mann, Jr., Asst. Atty. Gen., and Ray A. Fenton, County Atty., for appellee.

Heard before MOORE, C. J., and Le-GRAND, REES, UHLENHOPP, and HARRIS, JJ.

HARRIS, Justice.

This is an appeal from a conviction of delivery of a controlled substance in violation of § 204.401(1), The Code. Defendant's two assignments challenge trial court rulings admitting evidence. We affirm the trial court.

Steven Wayne Hill (defendant) was charged as a result of his actions on February 26, 1975. Two special agents assigned to narcotics and drug enforcement (Wilbur and Grassman) and two confidential informants went to a Des Moines residence in an attempt to purchase LSD. They went upstairs and talked to a woman who advised them they would have to wait until "Steve" brought the LSD.

Sometime later Wilbur, Grassman, and the two informants were taken downstairs where they met defendant. The defendant advised them his price was $100 for "fifty hits" of LSD. After the two agents claimed to be $5 short of his asking price, defendant sold the fifty dosage units to Wilbur and Grassman for $95.

George Bell testified for the defense. On direct examination Bell stated he was with Hill at the Des Moines residence on the night in question when four people came in and went upstairs. Bell stated that when the four came back downstairs defendant did not have any conversation with them and did not give anything to any of the four.

On cross-examination Bell again denied Hill had any conversation with or gave anything to either Wilbur or Grassman. The prosecutor then continued his questioning of Bell:

"Q. Did you at a later time come in contact with Special Agent Wilbur? A. Would you repeat that?

"Q. Did you at a later date come in contact with Special Agent Wilbur? A. Yes, I did.

"Q. Was that the next day? A. No, it was not.

"Q. When was it? A. Either the end of March or the beginning of April.

"Q. Didn't you come in contact with Special Agent Wilbur twice? A. If you are to include that evening of the 26th.

"Q. Then three times including that evening? A. No, twice.

"Q. Didn't you have conversation with Special Agent Wilbur regarding some more buys from the defendant of LSD? A. When?

"Q. At a later date. A. No, I did not.

"Q. Didn't you say you were going to make five dollars off of a later transaction? A. Did I say that?

"Q. Didn't you say that they had to deal through you to make any more LSD buys, that you were going to make five dollars on it? A. When was this?

"Q. At a later date? A. No.

"Q. The next day I think or several days later? A. No. I never saw Wilbur until the end of March or the beginning of April.

"Q. Where was that? A. That was at my residence across from 912 Kirkwood in the driveway.

"Q. Was there any discussion regarding LSD at that time? A. No. Agent Wilbur confronted me about getting some drugs someplace, if I knew anyplace where I could obtain drugs, and if so, you know, to get in contact with him. At that time I told him I didn't have anything to do with it. He still persisted. He asked if I could get him a pencil and paper so he could write his name down.

"Q. When was this date specifically, if you remember? A. I am not sure.

"[Defense counsel]: This is getting way off the line of direct examination. Counsel should limit his remarks to the scope of direct examination, Your Honor.

"THE COURT: Well, he may be laying a foundation for something. So right at the minute I'll overrule the objection."

The prosecutor then returned to his questioning of the witness's observations on the night in question.

■ I. Defendant's first assignment claims the trial court erred in permitting the cross-examination of Bell as above quoted. He claims the examination went unreasonably beyond the scope of direct examination. The State rightly resists this assignment on the ground any error was waived. It is to be noted defense counsel did not timely object, did not move to strike the testimony, did not ask that the objection precede the answer, and did not give any reason for failing to sooner object. Accordingly no error was preserved. *State v. Hinkle,* 229 N.W.2d 744, 748 (Iowa 1975); *State v. Hendren,* 216 N.W.2d 302, 305 (Iowa 1974).

II. Defendant's second assignment challenges a trial court ruling admitting rebuttal testimony of Agent Wilbur who was called again by the State after the defense had rested. Wilbur first reiterated making the purchase of LSD from Hill on February 26, 1975. Wilbur was then asked about a conversation with defense witness Bell occurring February 27, 1975, the night after the "buy" was made from Hill. Bell, it will be remembered, had already denied such meeting or conversation. In rebuttal the prosecutor asked Wilbur:

"Q. Did you have conversation with Bell? A. I did.

"Q. What conversation did you have? A. I asked him if Steve was around and if he had any more acid available.

"Q. What did he reply?

"[Defense counsel]: I object. Calling for hearsay.

"THE COURT: Overruled.

"Q. What did he reply? A. He said he had some and Special Agent Grassman and I replied we would pay eighty to eighty-five dollars as we thought the price was high. He indicated that Hill would not lower his price. He wanted one hundred five dollars, the five extra that were short from the previous night, and George also replied that

he was going to get five dollars from the deal.

"Q. Who was going to get five dollars from the deal? A. George.

"Q. George? A. I knew him as George. Later identified as George Bell.

"Q. The one who testified here today? A. Yes."

Hill contends this testimony was hearsay which " * * * must be presumed to be prejudicial unless the contrary is affirmatively established * *· *." *State v. Branch,* 222 N.W.2d 423, 427 (Iowa 1974). The State asserts the evidence was admissible to impeach the credibility of defense witness Bell.

■ A prior, inconsistent, out-of-court statement, offered for impeachment purposes, does not come within the definition of hearsay. Wigmore explains:

" * * * [T]he *prior statement is not primarily hearsay,* because it is not offered assertively, i. e., not testimonially. The hearsay rule * * * simply forbids the use of extrajudicial utterances as credible testimonial assertions; the prior contradiction is not offered as a testimonial assertion to be relied upon. It follows, therefore, that the use of prior self-contradictions to discredit is not obnoxious to the hearsay rule." (Emphasis in original.) 3A Wigmore, Evidence (Chadbourn Rev.1970) § 1018, p. 996. See McCormick on Evidence (Second Ed. 1972) § 34, p. 67 (hearsay but admissible to impeach); 81 Am.Jur.2d, Witnesses, § 596, p. 606 (not hearsay if used for impeachment). See also *Sims v. State,* 313 So.2d 388 (Miss.1975).

The general rules regarding impeachment by use of prior inconsistent statements were explained in *State v. Frommelt,* 159 N.W.2d 532, 535–536 (Iowa 1968):

"It is generally held a witness may be impeached by showing his testimony upon a material matter is inconsistent with a prior statement made by him. (Authorities). The impeaching testimony is not admissible to prove its truth, but solely to demonstrate the witness is not reliable because what he says now is contrary to what he said at some previous time. (Authorities). Since both statements cannot be true, the jury is entitled to weigh one against the other to decide if such a fickle witness is worthy of belief. This rule extends to oral statements made out of court, to written statements in whatever form, to testimony at a prior trial and to testimony at a preliminary hearing or before a grand jury.

"No matter what form the proposed impeachment takes, there must first be a foundation laid which adequately calls the attention of the witness to the time, place and circumstances of the prior inconsistent statement and which affords him an opportunity to admit, deny or explain it. This requirement is said to be necessary to avoid unfair surprise; to save trial time in the event the contradictory statement is admitted; and to give the witness a fair opportunity to explain any seeming inconsistency between the two statements. (Authorities)." See *Grocers Wholesale Coop., Inc. v. Nussberger Truck Co.,* 192 N.W.2d 753, 755 (Iowa 1971); *State v. Thomas,* 162 N.W.2d 724, 727 (Iowa 1968); *Basch v. Iowa Power & Light Co.,* 250 Iowa 976, 979–980, 95 N.W.2d 714, 716 (1959); 4 Jones on Evidence (Sixth Ed. 1972) §§ 26:2, 26:3, pp. 172–181; *McCormick, supra,* §§ 34, 36, 37, pp. 67–75; 2 Wharton's Criminal Evidence (Thirteenth Ed. 1972) § 468, pp. 410–421; *3A Wigmore, supra,* §§ 1018–1025, pp. 995–1021.

■ We believe a minimal but adequate foundation for the impeachment testimony was properly laid by the cross-examination of Bell, previously quoted. When Bell was questioned as to statements he made to Agent Wilbur the day after the LSD buy from Hill, Bell denied such a meeting. Bell denied any conversation regarding more buys from Hill or that he was to get $5 as a result of any more deals between Hill and Wilbur. The person to whom the statement was made, when it was made, and the subject matter of the statement all were established.

It should be noted the "place" where Bell was to have met with Wilbur was never

brought out by the prosecution. See *Frommelt,* supra, 159 N.W.2d at 536; *McCormick,* § 37, p. 72. However the purpose for requiring a foundation was fulfilled: " * * to refresh the memory of the witness as to the supposed statement by reminding him of the accompanying circumstances." *McCormick,* § 37, p. 72.

III. It is well settled, however, the right to impeach by prior inconsistent statements is not without limit. The subject of the inconsistent statement, if it is to be admissible, must be material and not collateral to the facts of the case.

This limiting rule is stated as follows: The " * * * courts maintain the safeguarding rule that a witness may not be impeached by producing extrinsic evidence of 'collateral' facts to 'contradict' the first witness's assertion about those facts. If the collateral fact sought to be contradicted is elicited on cross-examination, this safeguarding rule is often expressed by saying that the answer is conclusive or that the cross-examiner must 'take the answer'. * * *." *State v. Johnson,* 223 N.W.2d 226, 228 (Iowa 1974), quoting from *McCormick,* § 47, p. 98. See *In re Estate of Workman,* 174 Iowa 222, 236, 156 N.W. 438, 443 (1916) (" * * * It is elementary that one cannot impeach a witness on collateral matters drawn out on cross-examination.") See also *French v. Universal C.I.T. Credit Corp.,* 254 Iowa 1044, 1048–1049, 120 N.W.2d 476, 480 (1963); *Borough v. Minneapolis & St. L. R. Co.,* 191 Iowa 1216, 1221, 184 N.W. 320, 322 (1921).

The test for applying the limitation is stated by Wigmore: " * * * Could the fact, as to which the prior self-contradiction is predicated, have been shown in evidence for any purpose independently of the self-contradiction?" (Italics deleted.) *3A Wigmore,* § 1020, p. 1010. See *Johnson,* supra, 223 N.W.2d at 228.

Under this test we do not believe the remarks attributed to Bell were collateral. They clearly draw into question Bell's claim defendant gave no drugs to Wilbur on February 26, 1975. But for its hearsay nature the fact Wilbur was seeking "more" drugs from defendant and the fact defendant's price was $105 would both have been extremely relevant to the State's case. Bell was quoted as stating the "five extra" dollars were due because the agents "were short from the previous night", when the sale was made for which defendant was convicted. Bell's involvement in the arrangement and desire to make a profit might provide a separate theory of admissibility of the rebuttal evidence on grounds of showing bias or interest. See *People v. Lechner,* 60 Ill.App.2d 472, 208 N.E.2d 898 (1965).

Defendant's second assignment is without merit.

AFFIRMED.